GERHART et al. v. HARRIS COUNTY et al.*
(No. 824.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 26, 1922. Rehearing Denied Nov. 15, 1922.)

1. Appeal and error ⬅1169(3)—Pleading ⬅221—On overruling demurrer, plaintiff has **right to amend, and hence appellate court cannot affirm judgment on ground petition did not state cause of action.**

Where the trial court overruled defendants' demurrers to the petition, the appellate court cannot affirm the judgment for defendants on the ground that the petition did not state a cause of action, since if the petition was defective the plaintiffs should have been given the right to amend.

2. Highways ⬅120(4)—Required to compensate owners of land for damages caused by impairment of drainage in improvement of road.

Where a county and its agents in improving a public road dedicated to the public impaired drainage of land, the county was liable to owner for damages sustained, regardless of whether the county and its agents were negligent, since it is the absolute duty of the county in such case to make compensation.

3. Highways ⬅120(4) — Whether damage to crops was caused by impairment of drainage by acts of county in improving road or navigation district held for jury.

In an action against a county for damages to plaintiffs' crops, caused by impairment of drainage by the county and its agents in the improvement of a road, in which the county alleged that the damage was occasioned by the acts of a navigation district in disposing of the spoil from its dredging operations and

there was evidence to support such allegation, the issue should have been submitted to the jury on the county's request therefor.

**4. Evidence ⬤═142(1)—Testimony as to retail price of small quantities of corn and potatoes not admissible on issue of market value of crops.**

In an action for damage to corn and potato crops, testimony as to what witness paid for corn and potatoes in buying small quantities thereof *held* not admissible on the issue of the market value of the crops.

**5. Damages ⬤═112—Measure of damages for destruction of growing crops stated.**

The measure of damages for the destruction of a growing crop is its market value, if it has one, at the time and place it is destroyed, with interest from the date of its destruction; such market value being ascertained by deducting from the value of the probable yield under proper cultivation, when matured and ready for sale, the cost of cultivation and transportation to market.

**6. Evidence ⬤═142(3)—Evidence as to market value of cotton more than thirty days before destruction of plaintiffs' cotton not admissible in absence of showing that value remained same.**

In an action for damage to cotton crop, evidence as to the market value of cotton more than 30 days before the destruction of plaintiffs' cotton was not admissible, in the absence of a showing that the value of cotton remained the same.

**7. Evidence ⬤═501(7)—Testimony that cost of raising and harvesting a crop was approximately one-third of its market value held not admissible.**

In action for destruction of crops, testimony of two witnesses that the cost of raising and harvesting a crop is approximately one-third of its market value, constituting the opinion of such witnesses based on a series of crops not confined to the crops in question, *held* too indefinite, uncertain, and remote.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Action by Maggie Gerhart and others against the County of Harris and others. Judgment for defendants, and plaintiffs appeal. Reversed and remanded.

Taliaferro & Sonfield, of Houston, for appellants.

Louis, Campbell & Nicholson, of Houston, for appellees.

WALKER, J. We take the following statement of the nature of this suit from appellee's brief:

"Appellants—plaintiffs in the trial court—sued Harris county for damage to crops in the years 1918 and 1919, alleging that such damage was occasioned by the negligence of the county in shelling the Clinton Road, and removing and re-

placing culverts along the road near their property.

"The county answered with general demurrer and general denial, especially denying the allegations of negligence contained in plaintiffs' petition; and impleaded the Harris County-Houston Ship Channel navigation district, alleging that if plaintiffs' crops had been damaged, such damage was occasioned by the dredging operations of said navigation district on Buffalo bayou, in dumping the spoil taken from the bayou out upon the adjoining land, and filling up the ditches draining into the bayou."

Appellees' demurrers were overruled and the case proceeded to trial before a jury. At the conclusion of the evidence they moved for an instructed verdict, which was denied. Thereupon the case was submitted to the jury on the following special issues, which were answered as indicated:

(1) "Were plaintiffs' lands caused to be overflowed and the overflowed waters held thereon in the years A. D. 1918 and 1919 by reason of the county road in question being constructed and maintained where it was and in the manner it was? You will answer, 'Yes,' or, 'No,' as you find the fact to be." Answer: "Yes."

(2) "Did such waters, so caused to be overflowed and held on plaintiffs' lands, destroy any crops of plaintiffs on such lands which otherwise would not have been destroyed? Answer, 'Yes,' or, 'No,' as you find the fact to be." Answer: "Yes."

(3) "What would have been the value of such crops when matured and ready for sale, less the expense of such cultivation, as well as the cost of its preparation and transportation to market? You will here state the amount according as you may find it to be." Answer: "$1,090.00."

(4) "Was any hay of plaintiffs', in barn, destroyed by such overflow waters so caused by said road in the years 1918 and 1919, or either of those years? Answer, 'Yes,' or, 'No,' as you find the fact to be." Answer: "Yes."

(5) "What was the reasonable market value of such hay at the time and place same was destroyed? Answer by stating the amount." Answer: "132.50/100."

(6) "Were plaintiffs deprived of the use and rental value of their tenant houses on their lands during any time in the years 1918 and 1919 by reason of the overflow and holding of water on their lands caused by the county road being constructed and maintained as it was? Answer, 'They were,' or 'They were not,' as you find the fact to be." Answer: "No."

(7) "What was the reasonable value of the use or rental value of which plaintiffs were so deprived? Answer by stating the amount." Answer: "None."

(8) "If you have answered special issue No. 1 in the affirmative, and in that event only, then you will state: In what sum were plaintiffs damaged on account of sickness and ill health due to water backing up and standing upon their property? You will here state the amount according as you may find it to be." Answer: "$300.00."

---

⬤═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

(9) "If you have answered special issue No. 1 in the affirmative, and in that event only, then you will state: In what sum were plaintiffs damaged by reason of being deprived of the free use and enjoyment and ingress and egress to and from their property due to water backing up and standing upon same? You will here state the amount according as you may find it to be." Answer: "None."

(10) "If you have answered special issue No. 1 in the affirmative, and in that event only, you will state: What was the cost to plaintiffs herein of the necessary fertilizer used upon said land and necessary to make it fit for cultivation after said land had been soured due to water backing up and standing upon same? You will here state the amount according as you may find it to be." Answer: "110.00."

On the return of the verdict, appellees moved to set aside the verdict, which motion was overruled. Then appellants and appellees filed motions that judgment be entered in their behalf. Appellants' motion was denied, to which they except, and judgment was entered in favor of appellees, notwithstanding the verdict. To these orders appellants duly excepted, and predicate their appeal upon assignments of error based upon the refusal of the court to enter judgment in their behalf and on the judgment entered non obstante veredicto. By cross-assignments, Harris county complains of the insufficiency of appellants' petition, and the refusal of the court to submit to the jury the issue of whether appellants' damage was occasioned by excessive rainfall and the dredging operations of the Harris County-Houston Ship Channel navigation district, and of the admission and sufficiency of the following evidence on plaintiffs' measure of damages:

(a) Edward Brown testified:

"I had occasion during the year to buy Irish potatoes on the open market; I paid $3.50 a bushel for them. In 1919 I had occasion to purchase Irish potatoes, and I paid $5.50 a bushel. In 1918 I bought the Irish potatoes from B. A. Passmore, over here in the fifth ward; and I bought them from B. A. Passmore in 1919, also. I have been dealing with him about eight years. I buy all my groceries and feed from him.

"During 1918 I had occasion to purchase sweet potatoes and bought them at B. A. Passmore's, and paid $2.25; in 1919 I paid $3.75 a bushel.

"In 1918 I had occasion to purchase corn, and I purchased it from B. A. Passmore, and paid $2.15 a bushel; it cost me $4.30 a sack, that is, a two-bushel sack. (In reply to defendant Harris county, witness stated this was shelled corn.) In 1919 I purchased corn from B. A. Passmore, and paid $2.35 a bushel; it cost me $4.10 a sack. I fatten my winter hogs all the time, and I always use it for my chickens, and I kept it there for them."

Appellees make the statement in their brief, which is not controverted by appel-

lants, that this was "the only evidence offered by appellants to establish the market value of the corn and potato crop which they allege to have been grown upon the land during 1918 and 1919."

(b) J. F. Burwell, secretary of the Houston Cotton Exchange, testified as to the market value of cotton for 1918 as follows:

"I am familiar with the market value of cotton in Houston. I have a memorandum that I took from the financial records of the Exchange for September 3, 1918. My recollection is that they were the highest prices for the year. On September 3, the basis price for middling in Houston was 35.75 cents per pound, and my recollection is that those were the highest prices for that year."

(c) On the cost of raising and marketing the crops, appellants offered the following testimony:

Charles Oates testified as follows:

"I have been a farmer all my life. I am acquainted with the cost of raising and getting a crop to market, to the Houston market, that is, some parts of the crop, what I generally raised; I am acquainted with that; I have raised cotton and corn and potatoes, also sweet potatoes and Irish potatoes. It costs about one-third of the value of the crop for planting, plowing, harvesting, and getting it to the market at Houston from my place. If the gross yield would be, for instance, $2,500, the net would be obtained after deducting one-third. * * *

"The cost of plowing the land and getting it in shape for planting, and of planting it and of cultivating it, and of harvesting it, and of getting it in shape to sell, depends upon how he works it, I suppose; how he worked it would depend upon the state of the soil itself—how much he would have to work it, whether it was wet or dry, or whether it was sandy soil or whether it was black soil. It would also depend upon whether he worked it at the right time with reference to weeds in it. The cost of planting and cultivating it and harvesting it would depend largely upon the cost of labor; it would depend in part upon the cost of feed that he had to feed his teams in doing that work if he had any feed to buy. It would also depend upon whether he had teams of his own or had to hire teams. The cost of labor makes up the larger part of the cost of planting and cultivating and harvesting a crop. I think the cost of labor was about the same during the years 1918 and 1919; it is cheaper now than it was then; I would say it is about 20 per cent. cheaper; we can get men now for $1 a day, and then I had to pay $3 per day.

"I know that cotton is way down now. During that time I think it was about 40 cents; now if it is worth 12 cents, it would be less than one-third the value. I do not know whether the price of cotton was the same throughout those two years. I think the price of labor was about the same during these two years. The total return that a farmer would get for his crop would depend also upon whether the conditions were so good that he would raise a bumper crop or whether he would raise only a short crop. In plowing his ground for

planting and in planting the crop, and in cultivating it, the expense would be the same, for the same quantity of ground, whether he finally raised a bumper crop or a short crop. If he gave it the same cultivation in preparing the ground for planting, and in planting it, and cultivating and harvesting it, I don't know whether the proportionate expense would be much greater if he raised a bumper crop than if he only raised a short crop. I said a while ago that the cost of raising, planting, cultivating, and harvesting a crop was about one-third of the product of it. I don't mean, if he put in all of that labor and work in raising a crop and got only a short crop, that it would be one-third of that short crop; that just depends on the crop; the proportionate part of the proceeds that it would cost to cultivate it and raise it would vary according to whether he raised a good crop or a short crop; if he didn't raise anything he would be out, but in dollars and cents the cost of having cultivated and harvested that crop would have been the same, but there might be quite a difference in the amount of money he would ultimately get from his crop after he has harvested and sold it. What I mean is, if he plants his crop and makes a fair crop out of it, it would cost him just about one-third to plant and harvest that crop as he would get off of the market. If the labor was up he would be bound to get a good price for his crop. If the price of labor remained the same, and if the price he got for his product varied, then that would not hold good.

"I could not undertake to state in dollars and cents how much it would cost to prepare the land and plant it and cultivate it, and to harvest a crop in 1918 and 1919, because I was not paying any attention to what it was at that time, and I would not say that I know at that time.

"The proportion of the cost of planting and raising a crop to the amount that the farmer would realize from that crop would also depend upon what kind of a crop he planted and raised, whether cotton, corn, potatoes, oats, wheat, or whatnot, and it might vary with reference to each particular kind of product.

"If the price of sweet potatoes was quite different in 1919 to what it was in 1918, and if the cost of labor was the same during those two years, there would be very little difference, I should think, in the cost of raising it for the two years. That difference would depend upon the difference in price he got for his sweet potatoes; if the price was different in those two years, then it would make a difference in the proportion of the expense as against the final proceeds, I think.

"If there was a difference in the price of corn between the years 1918 and 1919, if it cost one-third of the crop for 1918 to plant it and cultivate it, it would have cost something different in 1919; also that would depend upon the quantity that was raised and upon the acreage that was planted. The same thing would apply to the relative cost of raising cotton for those two years. If the price of cotton was quite different in 1918 from 1919, and if the cost of labor was the same, then if it cost exactly one-third to raise the crop for one year, it would not be the same for the other year.

"I would not undertake to fix in dollars and cents what the cost, or what would have been the cost, of planting, fixing the land for planting, cultivating, harvesting, and putting in shape to sell any particular crop during those two years. * * *

"I stated in my first testimony with reference to raising and harvesting a crop, etc., that this one-third included getting it to market. If a person did practically all of their own work, the cost of labor would have nothing to do with the cost of harvesting, raising, planting, and getting this crop to market. I am familiar with the manner in which the Gerharts worked their land; they have their own means; they do all the work themselves. Taking the general average, no matter what the crop would be, the planting, working, and harvesting would be one-third, according to my experience with farming."

Frank Gerhart testified as follows:

"My name is Frank Gerhart. I am farming, and I work on public works down near Clinton. I live at home there, with Maggie Gerhart, and Katie Gerhart.

"I am acquainted with the general condition of this property. I farmed off and on all my life. I am acquainted with the cost of planting, preparing, harvesting, and getting a crop to market; from our place to Houston; it costs one-third of the crop, or about one-third of the crop, to plant, cultivate, harvest, and get the crop to market. If the gross crop is valued at $2,500, the profit would be $2,500 less one-third of that amount."

### Opinion.

The following conclusions dispose of all questions presented by this appeal:

[1] 1. As the trial court overruled appellees' demurrers to appellants' petition, we cannot affirm the judgment in their favor, on the ground that the petition did not state a cause of action. They should have been given the right to amend, if the petition was defective.

2. We are inclined to think the petition was subject to a demurrer, but because of its great length we cannot make an intelligent statement from it. The Supreme Court, in Nussbaum v. Bell County, 97 Tex. 86, 76 S. W. 430, clearly sets forth the necessary allegations to constitute a cause of action against a county on facts similar to the facts in this case. As we analyze the statement of facts, appellants have made a case within the rule therein announced, as will be more fully set forth in a subsequent conclusion, and we suggest that the petition be amended to correspond with the facts.

[2] 3. The facts of this case raise the issue that Harris county and its agents impaired appellants' drainage in improving a public road dedicated to public purposes, and that its agents, in what they did for its benefit, were discharging duties imposed upon them by law. The issues thus raised, together with the affirmative findings of the jury in favor of appellants, would make a

cause of action against the county. Watkins v. Walker County, 18 Tex. 585, 70 Am. Dec. 29; Hamilton County v. Garrett, 62 Tex. 602; Wooldrige v. Eastland Co., 70 Tex. 680, 8 S. W. 503; Railway Co. v. Fuller, 63 Tex. 467; Railway Co. v. Hall, 78 Tex. 172, 14 S. W. 259, 9 L. R. A. 298, 22 Am. St. Rep. 42; Voss v. Harris County, 33 Tex. Civ. App. 249, 76 S. W. 600; District v. Ft. Worth, 106 Tex. 148, 158 S. W. 164, 48 L. R. A. (N. S.) 994; Palo Pinto County v. Guaines (Tex. Civ. App.) 168 S. W. 391; Brewster County v. Forney (Tex. Com. App.) 223 S. W. 175; Dallas County v. Barr (Tex. Civ. App.) 231 S. W. 453; Nussbaum v. Bell County, supra.

4. The negligence of Harris county and its agents was not an issue. If, in fact, it damaged appellants' property "for public use," it rested under the absolute duty of making compensation, and could not defend on the ground that ordinary care had been exercised in improving the road. Nussbaum v. Bell County, supra; Stubblefield v. Railway Co. (Tex. Civ. App.) 203 S. W. 936, and authorities therein cited.

5. If the rainfall during the years 1918 and 1919 was so excessive that the drainage, as it existed before it was impaired by appellees, was not sufficient to take care of the water, the issue of proximate cause would be raised if properly pleaded, and, if raised by the evidence on another trial, that issue should go to the jury.

[3] 6. The evidence raises the issue that appellants' damage was occasioned by the acts of the navigation district in disposing of the spoil from its dredging operations in Buffalo bayou. As that issue was affirmatively pleaded by Harris county as a defense, it should have been submitted to the jury on request. Railway Co. v. Rowe (Tex. Com. App.) 238 S. W. 908; Railway Co. v. Washington, 94 Tex. 510, 63 S. W. 534.

[4, 5] 7. The testimony of Benson, above given, as to what he paid for corn and potatoes in 1918 and 1919, was not admissible. Evidence of the retail price of small quantities of corn and potatoes afforded no basis for determining the market value of appellants' crops. Hammond v. Decker, 46 Tex. Civ. App. 232, 102 S. W. 453; Waldrop v. Goltzman (Tex. Civ. App.) 202 S. W. 337; Needham Piano Co. v. Hollingsworth, 91 Tex. 49, 40 S. W. 787; Tucker v. Hamlin, 60 Tex. 175; Railway Co. v. Novit (Tex. Civ. App.) 199 S. W. 496. On authority of Railway Co. v. Pape, 73 Tex. 501, 11 S. W. 526, we approve appellees' following proposition:

"It is well settled that the measure of damages for the destruction of a growing crop is its market value, if it has one, at the time and place it is destroyed, with interest from the date of its destruction. To arrive at the value of the crop so destroyed is to prove its probable yield under proper cultivation, the value of such yield when matured and ready for sale, and also the expense of such cultivation, as well as the cost of its cultivation and transportation to market, deducting the cost of cultivation and transportation to market from the value of the probable yield will give the market value of the crop destroyed."

[6] 8. The evidence as to the market value of cotton was too remote, had no probative force, and should not have been admitted. The evidence as to value related to a time more than 30 days before the cotton was destroyed, and there was no showing that the value of the cotton remained the same from that date until appellants' cotton was destroyed. In Land & Irr. Co. v. Mercedes (Tex. Com. App.) 208 S. W. 904, the Commission of Appeals said:

"The trial court found that had water been furnished seven or eight days after April 20th, there would have been no damage. The undisputed evidence is that the cabbage would not have matured in less than two or three weeks after such irrigation. The value of the yield, when matured and ready for sale, is the proper basis for the determination of the damage. Railway Co. v. Pape, 73 Tex. 501, 11 S. W. 526. The market value prior to May 8th should therefore have been excluded."

[7] 9. The testimony of Oates and Gerhart, to the effect that the cost of raising and harvesting a crop is approximately one-third of its market value, was too indefinite, uncertain and remote. It was only an opinion of these witnesses based on a series of crops, and was not confined to the crops in question.

10. From the foregoing conclusions, it follows that the court erred in rendering judgment in favor of appellees non obstante veredicto. Gulf Refining Co. v. Bonin (Tex. Civ. App.) 242 S. W. 776, and authorities therein cited. Also, because of the errors committed against appellee Harris county, the motion to set aside the verdict should have been granted and a new trial ordered by the trial court. Therefore it is our order that the judgment of the trial court be in all things reversed and this cause remanded for a new trial.

Reversed and remanded.